In our next case this morning is Gage v. Richardson. Good morning. May it please the court. Let's wait one moment until we change up the Zoom squares here. Okay. All right. Yeah, we've got just a substitution of counsel at the Department of Justice. All right, and there's Ms. Potts. Mr. Code, you may proceed. Good morning. May it please the court. My name is Richard Code. I represent Patrick Gage, the appellant. The Wisconsin judicial system failed Patrick Gage. Gage was accused of sexually assaulting his daughter years before he was charged in court, and there are several key parts of these failures I'd like to focus on today. First, as to the substance here, Gage received the ineffective assistance of counsel. His lawyer interviewed zero witnesses. Gage was charged with one of the most serious offenses in the Wisconsin code, and his lawyer didn't interview anyone, and that left two critical witnesses on the sideline at trial. Only one witness testified on behalf of the defense, and that was Gage himself. Second, in reviewing Gage's ineffective assistance of counsel claim for failure to investigate, the Wisconsin State Court of Appeals' per curiam opinion stated the wrong Strickland standard for prejudice, one that this court has rebuked the Wisconsin State Court for more than once and other state courts, and its single paragraph of analysis of the failure to investigate claim, the few facts that it actually did consider were flawed. The analysis was flawed. And finally today, I hope to be able to talk about the reason or the fact that because the Wisconsin Court of Appeals applied the wrong legal standard for prejudice, this court should not give it any deference under AEDPA. So moving to ineffective assistance, the State Court of Appeals' opinion did not address deficient performance. That means we're in a de novo review here. I do think that the district court, however, provided a pretty thorough analysis of this prong of Strickland. I'll just touch on a couple of things I think might be important for the court to consider. First, I think it's critical to look at what did the defense lawyer know prior to trial about the two witnesses I've identified here, which is Nancy and Josh Gage. Nancy Gage was Patrick Gage's mother, H.G.'s grandmother, and Josh was H.G.'s brother and Patrick Gage's son. And prior to trial, counsel knew that they all lived together. Every single time H.G. visited Patrick Gage, Josh Gage was there. And at least during the times when the visits were to Nancy Gage's house, Nancy Gage was there. Specifically, counsel knew that Josh had told the police in a police report that he had never witnessed any sexual abuse or anything suspicious to that end. He also knew that they all slept in the same general area. He knew that Nancy was very close with H.G., and yet he didn't do the basic minimal work of a criminal defense lawyer. You have two witnesses who are with H.G. and Patrick Gage every single time they were together, and H.G. claimed that almost every time Patrick Gage sexually abused her. And yet— The lawyer had some preview with respect to Josh, not Nancy, but the lawyer had some preview of what he might say through the police reports. And it wasn't necessarily favorable to your client. Why wouldn't that be a sufficient basis for him not to interview Josh? Well, I guess I would disagree with that characterization insofar as he did have an indication that Josh had said he had never seen any kind of sexual abuse. That was in the police report. To me, as a defense lawyer, that's an automatic interview then, particularly with the nature of this case where the allegations were so far in the past and your lines of defense are so limited, you have to go interview that person. Even if he might have said, well, I'm upset with my dad because of this, that doesn't mean you don't interview them. I think you have to go interview them. I want to know good and bad as a defense lawyer. I can't know that. I can't take at face value a police report. I've looked at plenty of police reports in my 16 years and you can't take them at face value. And so your job as a defense lawyer is to investigate that lead. And at worst, I get the answer in the negative, right, that I've determined, OK, Josh is a dangerous witness. I'm not going there. But in this case, the defense lawyer didn't do that. And I think the proof is in the pudding in terms of Josh's testimony, the post conviction hearing. You don't know unless you interview someone what they're going to say. And I think that his testimony at the post conviction hearing was entirely positive in favor of Mr. Gage. And I think what really I think should bother the court about on the deficiency prong was the circuit court in Juneau County echoed the defense lawyer's testimony saying, look, once once counsel made the decision not to present Josh or Nancy as witnesses, well, then why bother interviewing them? It's a waste of time. And as this court is noting, Crispy Duckworth, that's an amazing statement. That is completely backwards. You can't make an informed, reasonable decision about a witness, putting on a witness unless you do some minimal investigation. And I think the district court found at least pretty easily that there was deficient performance here. That argument has to be contextualized within the facts of this case, as we know them to be based on the post conviction hearing, the Mockner hearing. And that those facts are that the two witnesses that were omitted from the investigation and it wasn't that they were entirely omitted from the defense attorney's investigation. The defense attorney, as just even noted, had the police report about the investigators interview with the brother, with Josh and and the defense attorney knew based on conversations with his client, or at least he so testified that that what the mother would generally say and determined that neither witness would be helpful. And and we now know and this bleeds into the prejudice analysis, but we now know that these two witnesses would not have added much given the nature of their testimony, which is to say that they were in the same house during the relevant period of years when the didn't see anything that that's a marginal evidentiary value. So given what the defense attorney did know, the failure to conduct a more formal interview, and it's my understanding that he testified that he he spoke with both of these witnesses, but he didn't do a formal interview of them. I I actually disagree that that's the an accurate summary of the testimony by by the defense counsel when asked directly, did you ever interview Nancy Gage? He said, no, I don't recall that. When asked, did you ever speak with Josh Gage? He said, no, I don't I don't think reading a police report is an investigation. I mean, I guess maybe that's part of it as well. I don't see it that way. And I think, too, I guess I disagree with the import of their testimony, and I think it's critical to look at that, and this is Toliver and Mosley looking at it in the context of the state's proof here, the state's proof. All it was was saying, hey, between two and eight years ago, I was sexually abused by my dad almost every time I visited him. And so that leaves Mr. Gage in a position years later where he has no potential to have an alibi witness, no potential for an eyewitness, no physical evidence. His only real defense is to say, I didn't do that. And to have two witnesses to say, look, I mean, for Josh in particular, he narrows the time of time frame where this could have happened because he said, hey, I stayed up late. I stayed up till one to three in the morning playing video games every night. Nancy saying, hey, I went down into the basement to my sewing room, my quilting room until eleven o'clock at night. I would go down there and that's where they were sleeping. And even Nancy's testimony about, hey, I had a really close relationship with H.G. And I never saw anything amiss. I never saw any strange behavior. She had a normal father-daughter relationship. The jury heard none of that. All they heard was Package saying, I didn't do this. And I think that given when you're when you're when you're comparing the state's evidence, which is just a single statement by H.G. to that type of testimony, I mean, look, the state put on H.G.'s mom. So she wasn't alone. When you compare those and you add those up, sure, in other types of cases, in the context of other types of cases where there's physical evidence, eyewitnesses, alibi witnesses, maybe this testimony wouldn't have been valuable. But in the context of this particular case, I think it was critical. And I think, you know, you saw it. Look, the jury acquitted on count one. There were issues here, I think, with H.G.'s credibility and any any evidence, any witness statement that would tend to hurt her credibility or help Mr. Gage's credibility was critical. And the defense lawyer really did nothing. What is it about Josh's testimony? You've noted the that he testified he was up until one or three every night playing video games. But H.G. said this happened at night after they went. Everybody was asleep. What else is it about Josh's testimony that you think conflicts with H.G.'s? Well, I think in particular, and I think the Court of Appeals got this wrong, the Wisconsin Court of Appeals, Josh, you know, H.G. said, look, we sometimes we slept in the bedroom, sometimes we slept on the couch and made it testimony sounded like it was sort of a varied thing. And so that would open up opportunities for Mr. Gage to act in this manner, as he alleged. But what Josh testified was, look, no, I don't even remember her sleeping in the bedroom. But wasn't that testimony only relevant to count one, which he was acquitted on? That that in particular, yes, but Josh said, I usually slept on the couch, which is where count two was. And when pressed, he said, well, maybe like one or two times I slept in a bedroom, but I almost always slept on the couch. And that's not what the testimony was a trial from H.G. I think the, you know, narrowing that window, Josh would have testified, hey, my dad fell asleep in the recliner at eight o'clock every night. Heather or H.G. went to bed after that. I went to bed way later than that. That, at the very least, is narrowing. All she testified to was it happened at night. She didn't say what time. She didn't say the early morning hours or 4 a.m. or 5 a.m. She said at night after everybody went to sleep. She did. She said at night. I don't know that I can't say my recollection. I think she said when everybody was sleeping, that came out in the testimony. So look, at the very least, Josh's testimony would eliminate 8 p.m. to 3 a.m. or 1 a.m. every day. And I think it's, you know, his testimony about the cabin, I think, was very critical as well. It's a one-room cabin with a loft. And he said, I would have heard everything. I heard people talking. There's a creaky ladder. And the allegation from the cabin, you know, I think it, look, it goes back to Mr. Gage is not in a position where he could say, hey, on May 15th of 2002, this is what was in the house, because the allegations weren't that specific. And so any testimony that would cast some doubt on H.G.'s story is critical. And I, that's why this, the trial counsel was deficient, and that's why Gage was prejudiced. I think, too, you have to, in looking at the Wisconsin Court of Appeals opinion, why I don't think this court should give it any deference, cited the wrong legal standard. It cited a case that also cited the wrong legal standard. And the analysis was so cursory. There were three pieces of what I would call contested evidence that it considered. And I don't think it's a matter of opinion, as Richardson suggests. I think it got those, two of those three pieces of testimony wrong. One, what we've already covered, which is the couch versus the bedroom. Two, you know, it didn't consider that Josh generally last, or went to bed last and was, it was at one or three in the morning. It didn't give that level of detail. And number three, it stated that the Court of Appeals opinion stated that Nancy was not generally in the basement at night, and that's wrong. She testified, the record site is R-10, 17, page 91, that she would routinely go down into the basement until 11 o'clock at night to go to her quilting room. And so I don't think that there's any substantive analysis in the procuring opinion from the Wisconsin Court of Appeals that would, that is worthy of this court's deference. It's the wrong legal standard. It's a cursory analysis and it didn't discuss the context, which is critical, as we know from Mosley and Tolliver, of the state's evidence and the relative strength or weakness of the state's case. And it also didn't discuss the cumulative nature of the testimony from Nancy and Josh. And it left out, as the district court pointed out, a lot of pieces of their testimony that are important, particularly when you consider them in a cumulative nature. Again, this is a case where there's just a statement from a person. There is no other evidence. And to discount Josh and Nancy's potential impact on this outcome was wrong. Mr. Cote, your time has expired. Thank you. Thank you. Ms. Potts. You're muted. Still muted. Good morning. May it please the court. My name is Abigail Potts. I'm an assistant attorney general with the Wisconsin Department of Justice, and I represent the respondent appellee. Mr. Gage does a really good job painting a picture of a situation where a trial attorney completely disregarded two key witnesses. But the problem with this case is that the actual record tells a very different story. And with that in mind, there's two main things I want to address this morning. Basically, just clarifying the two prongs of Strickland as applied to this case. One, I want to briefly discuss prejudice because this case can begin and end on the prejudice prong of Strickland. And secondly, I want to take a little bit of time to talk about deficient performance from our perspective, because that is the prong about which I think a lot of the facts and the record have been a little bit distorted. And it's the prong that I think the district court simply got wrong by not affording proper deference under Strickland to a tactical decision of trial counsel. So I'll start with prejudice. And I and I think this is the prong that this prong really comes down, as we all know, to the Mockner hearing testimony of Josh and Nancy and what came out at that hearing. It is the state's position that the insignificant nature of that testimony of Josh and Nancy's testimony made it well within the confines of reasonable for the state court of appeals to determine that their testimony did not create a reasonable  And one of the one of the key facts in the record, I think, that really bolsters this finding and this decision by the state court is the fact that at closing argument, trial counsel consciously and expressly pointed out to the jury that neither Josh nor Nancy testified on behalf of the state. So what trial counsel was doing, and we know this from the Mockner hearing testimony by trial counsel, is he was raising for the jury the fact that Josh and Nancy could not support these charges. So the jury knew that. And we know from the from the Mockner hearing testimony from Attorney Burkos as well, that he did this consciously because he thought he could get the same benefit out of that inference that he could get by calling them as witnesses without the possible detriment that those witnesses could cause. So we know that the we know that the jury heard that. We know that the jury, when they were deliberating, knew that neither Josh nor Nancy could support the state's case. And I think that's a real. Didn't both sides attempt to exploit the evidentiary gap? And that's true, they did, they both used it in their own way. The state also said, well, you didn't you didn't put them on either. But I think that what that shows for a jury is that they didn't have something to provide. And what we see in the Mockner hearing is exactly that play out. Josh and Nancy's testimony. Ended up being precisely what Attorney Burkos thought it was going to be. And I think sometimes, you know, Mr. Gage does a good job trying to really parse out and find any possible discrepancy between Josh's testimony and the victim's testimony. But when you really go back and you read that transcript. Josh is testifying in a rather reluctant way. He is not offering up alibi witness testimony. He is not offering up a any strong defense of his father. He is he is being led by both attorneys and basically says he didn't see anything. And that is something that the jury basically already knew because the state did not use them. And so I think that just adds to that is a fact in the record that adds to the reasonableness of the state court's decision. And I think it is important to remember that we are under EDPA for this, that we the prejudice. We really draw that conclusion, though, that the jury made that determination when I'm sure they were instructed to side this case only on the evidence presented in the courtroom. And you're talking about attorney argument now. There was no evidence presented one way or the other about what Josh and Nancy saw or heard. So how can we draw that particular conclusion? No, we don't know. You're right, Your Honor. We don't know exactly what was in the minds of the jurors when they were considering this evidence. But what we do know is that it was brought to their attention that they were not used by the state in support of its case. And this kind of also touches on the deficient performance prong, which we can get to in a minute. But this came out at the Mockner hearing that this was a conscious decision by trial counsel to alert the jury of that fact. And I think isn't that a performance prong as opposed to a prejudice prong argument? Yeah, you're right. It's related to both of them. The attorney's decision to raise that with the jury goes to his trial tactics on how he wanted to present that evidence. But I think it's also important to know that there was a discussion by both sides in front of the jury that highlighted the fact that Josh and Nancy were not called as witnesses. And what that relates to is just more generally that everything that was said, basically everything that was testified to by Nancy and Josh basically comes down to we didn't we didn't see anything. We didn't know anything was going on. That's all. There's nothing more in their testimony except for small discrepancies between what Josh describes, you know, the layout of the house. But I think in some ways, I think those get very overblown in the briefing, because when you really read the Mockner hearing transcript, you see that Josh acknowledges he's speaking in generalities. He's saying generally, I don't remember every time. So he by no means says absolutely every time I slept on the couch or absolutely every time the victim slept on the couch. That's just not what the testimony says. And it's also not the nature of the testimony. The testimony itself is quite, I find it quite reluctant. It is not glowing. It's not a major defense of his father. So so I think there is plenty in the record to to uphold the state court's decision on the prejudice prong, especially under in the habeas context that we're in and under EDPA. What about cumulative impact of both Josh and Nancy saying that they didn't see anything? I think you would agree this trial appears to have come down to credibility. Do they believe H.G.? Do they believe Mr. Gage? Why wouldn't the cumulative impact of Josh and Nancy, who from all the testimony were around or in the home at the time this was going on, asleep but in the home? Why would their cumulative testimony impact the prejudice prong? A couple of reasons. The first is that from reading the trial transcript, you see how credible the victim comes across. She gives a lengthy testimony. She is bright. She is articulate. She is specific in ways that Josh's Lochner hearing testimony is not. Her testimony is just far more specific and substantive. Even going down to talking about how her dad psychologically changed over time in terms of the assaults. So there is there's a lot of there's a lot of substance to her testimony. And Nancy and Josh, again, I kind of referenced the fact that the jury was aware that they did not testify on behalf of the state. I think it's pretty fair to assume that they could then assume that they weren't they couldn't say they saw something. And so I think the critical the critical components of their testimony were already aware or before the court that the jury was already aware of them. So I think it was very reasonable of both the state circuit court and the state court of appeals to find that they don't and the district court in this case of three courts to find that. That there was not a reasonable probability that their testimony would have affected the outcome. And I think that has to do with the lack of substance from Josh and Nancy's testimony in general. I think it has to do with the. The credible nature and the substance of the victim's testimony, and I think that's what the court saw is they just saw that after the Mockner hearing. They everybody realized that Josh and Nancy testified to pretty much exactly what attorney Burkos thought they were going to, which was not much. And that we should not give the prejudice analysis of the court of appeals at the difference because of the court statement of the legal standard. Yes, and and we disagree, obviously, and we've said in the brief and I would say that agree that the legal standard was misstated or you disagree that decision doesn't get deference or it's a good question in our brief we acknowledge that the court misstated it, although, to be honest with you, your honor in preparing in preparing even more for argument and rereading all the cases that you got that the 7th circuit has issued on this decision. I don't entirely think that the standard cited by the state court of appeals is wrong and I'll tell you why I think that what the cases say that find an incorrect standard being cited. Is that the court is applying an extra burden on a defendant to show that the trial or the process was fundamentally unfair unreliable. What the court state court did in this case was basically say what is said in Strickland, which is it's rendering unreliable the outcome and I think the difference is outcome versus process. So, well, I completely agree and the state agrees that it would have been better for the court of appeals, the state court of appeals to simply cite Strickland and the more common language on that. I think that the standard is is not actually substantively wrong, because what it's asking is, does it make the outcome the conviction. Unreliable and strict blend itself of an of an additional. Finding that the trial was fundamentally unfair. It doesn't it doesn't use that language that would have been a heightened burden. Yes, yeah. Under the case law. I'm sorry say that one more time your honor. Adding the component of fundamental unfairness imposes a heightened burden in a way that praising the standard is one of unreliable and unreliable verdict is not a heightened standard. I would agree with that and I would, I would add that I think it also is relevant to talk about what is unreliable if it said that the trial itself. Is unreliable somehow as a process. I think that adds another level of burden, but bringing into question the credibility or the reliability of the conviction is absolutely what Strickland wants you to do. It it's we're not asking the defendant to show that it absolutely would have had a different outcome. No, it's a reasonable probability of a different result. That means, is it going to affect the outcome? Is it, did it have any effect on the outcome? And that's essentially what the court stated as its standard. And then it it's from the state's position that even if this court thinks that the standard that it's cited is is wrong. It applied the standard that is put forth in Strickland, which is it looked at the evidence from the hearing. It applied it to the evidence from trial. And it decided whether it was going to have an impact on the outcome and it decided it didn't. Now, I'm not going to say that the Court of Appeals decision was the most thorough and well analyzed decision that we've seen it was short. It was fairly succinct. And but it was it. I, I, I just don't I simply don't think you can say that it was contrary to Strickland at all, because it did exactly what Strickland wants you to do. Which is look at the new evidence in light of the old evidence and what kind of effect does that have on the outcome? I think Mr. Code's back up argument is that even if this isn't contrary to Strickland, based on the statement of the prejudice standard, then it's an unreasonable application of Strickland. Sure, and I, I would respond by saying, I don't think it is it. What they did is they looked. The court is not obligated to cite every single piece of of testimony from the trial and the Mockner hearing and compare them all. What the court did is it if it looked at them, it stood back and gave it kind of a global view of the testimony. It pointed out some specifics that it said, look. Most of the testimony is fairly consistent. Some of it, it actually corroborates each other. There's minor differences, but nothing significant. So that is what they're supposed to do. They probably could have done it even better. Actually, they could have done it even better. But I, I think it withstands scrutiny at this level under under habeas and it should be afforded at the deference on the prejudice front. And then I'm almost out of time, but I'll just say that it's also the state's position that there was not deficient performance in this case, either. And I'm out of time, so I will stop there. All right. Thank you very much. I think you had all of your time, but you may have a minute in rebuttal if you have anything like to appreciate that and I'll, I'll get right to the heart of prejudice here. There's one thing that the Juneau County Circuit Court got right, in my opinion, in the post-conviction hearing, and it was when it found, and this is a quote, this was a credibility case, and Nancy's testimony, if believed by the jury, would have undermined the credibility of HG. And then it said, well, gee, I'm not going to sit here and say, well, gee whiz, maybe he should have called her, maybe things would have been different. That's not the test this court has to follow. Well, that's exactly what courts should do on a post-conviction motion like this. And that was the judge who sat there and watched Nancy and Josh testify and judged their credibility and judged that Nancy would have hurt HG's credibility, and that wasn't brought to the jury. In terms of, I think, deference, the state, or Richardson, is absolutely wrong. This court has said in Washington v. Smith, Mosley v. Atchison, that that deference, that stating the wrong legal standard, implying the wrong legal standard, this court should not give deference. Thank you. Thank you very much, and our thanks to both counsel. The case was taken under advice.